UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| IN RE:<br><br>SLEESTAK, LLC,<br><br>    Debtor. | Case No. 21-20237-NGH |
| HANS WEIG,<br><br>    Plaintiff,<br><br>v.<br><br>MICHAEL STANLEY,<br><br>    Defendant. | Adv. No. 22-07008-NGH |

MEMORANDUM OF DECISION

On May 15, 2022, Hans Weig ("Plaintiff") commenced this adversary proceeding against Michael Stanley ("Defendant") seeking to invalidate a promissory note and deed of trust, or alternatively to reduce the amount owed under the promissory note. Doc. No. 1. A trial on the matter was held on May 2 and 3, 2023, after which the parties submitted written closing arguments. Doc. No. 48, 49, 57, & 58. The Court took the matter under advisement. The Court has now considered the testimony and evidence presented, the briefs and arguments of the parties, and the applicable law. The following Memorandum

MEMORANDUM OF DECISION - 1

constitutes the Court's findings of facts and conclusions of law.  *See* Fed. R. Bankr. P. 7052.[1]

**FACTUAL BACKGROUND**

Plaintiff and Defendant met in early 2019 and became friends.  Shortly after, the parties began discussing the idea of going into business together.  In May 2019, the parties became aware that a piece of real property was for sale located at 401 W. Dakota, in Hayden, Idaho (the "Property").  Seeing it as a good business investment, the parties created the entity Sleestak, LLC to purchase the Property.  Pursuant to Sleestak's operating agreement, Sarah Nelson, Defendant's girlfriend at the time, was the sole member of Sleestak.  Ex. 206.  Plaintiff never saw the operating agreement and contends Defendant and Plaintiff were meant to be the members, with Ms. Nelson acting as the manager.

On May 31, 2019, Plaintiff, Defendant, and Ms. Nelson obtained cashier's checks and money orders from several different locations in order to provide the down payment needed to purchase the Property.  Defendant provided $35,460 and Plaintiff provided $61,000 towards the down payment, with Sleestak financing the remaining portion of the purchase price.  After collecting the necessary funds, the parties went to Kootenai Title to complete the closing.

On September 3, 2019, Sleestak and Defendant entered into a promissory note for Defendant to lend Sleestak funds.  Ex. 200.  The loan was secured by a deed of trust on

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

MEMORANDUM OF DECISION - 2

the Property. Exs. 200 at 4, 201, 210. Under the promissory note, Defendant extended a maximum principal sum of $176,000. *Id.* This permitted Sleestak to make draws from the loan for necessary business purchases, and included the funds already paid by Defendant for the purchase of the Property. Additionally, the promissory note included a revolving line of credit not to exceed $210,000. *Id.* The promissory note provides for 8.5% interest and for Defendant's attorney fees in the event Defendant incurs fees to enforce the note. *Id.*

On June 11, 2021, Sleestak filed a voluntary chapter 7 bankruptcy petition.[2] Case. No. 21-20237, Doc. No. 1. On October 3, 2021, the chapter 7 trustee, David Gardner, sold the Property for $575,000, with the estate realizing net sales proceeds of $313,323.82. *Id.* at Doc. No. 42. Defendant's lien attached to the net sale proceeds pending resolution of the dispute over Defendant's secured claim. *Id.* at Doc. No. 37. On April 18, 2022, Defendant filed a motion seeking to compel turnover of the sale proceeds encumbered by his lien, or alternatively relief from the automatic stay. *Id.* at Doc. No. 79.

Plaintiff objected, and subsequently initiated this adversary proceeding.[3] Plaintiff alleges he and Defendant created Sleestak in 2019 to purchase the Property, with both parties being 50% members and Defendant's girlfriend acting as the manager for the

---

[2] Pursuant to Fed. R. Evid. 201, the Court takes judicial notice of its files and records in this adversary proceeding, Case No. 22-07008-NGH, as well as the main bankruptcy, Case No. 21-20237-NGH.

[3] The Court notes Plaintiff filed a motion to amend the complaint on October 14, 2022. Doc. No. 12. This motion was not set for hearing and the Court never ruled on the matter. The Court determines the motion is now moot.

MEMORANDUM OF DECISION - 3

entity. Plaintiff asserts he contributed $61,000 for the purchase of the Property with the understanding he and Defendant would share the profits from the eventual sale of the Property.[4] Defendant claims under the promissory note and deed of trust, he is owed $166,468.71.[5]

**DISCUSSION AND DISPOSITION**

A.   **Validity of Deed of Trust**

    1.   **I.C. § 45-1504**

First, Plaintiff asserts the deed of trust is facially invalid. In the complaint, Plaintiff asserted the deed of trust was invalid because Defendant was "identified as the Trustee and the Beneficiary." Doc. No. 1 at 3. Plaintiff's argument has evolved to claim that, pursuant to I.C. § 45-1504, Defendant was not a valid trustee. Defendant concedes he was not a qualified trustee under I.C. § 45-1504(2), and thus the deed of trust did not initially name a proper trustee. *See* Ex. 201. Defendant asserts, however, this error was later remedied when a substitute trustee was appointed and the amended deed of trust was recorded. Ex. 210. However, this amended deed of trust was not recorded until October 26, 2022, over a year after the petition date. *Id.* Thus, the Court must consider whether, as of the date the petition was filed, the deed of trust was valid and enforceable despite the lack of a proper trustee.

---

[4] Plaintiff also initiated a separate adversary proceeding against Sleestak and Sarah Nelson, alleging that Plaintiff is a 50% member of the LLC and is entitled to $61,000 from the sale of the Property. Adv. No. 22-07007. That issue has also become central to Plaintiff's claim in this action.

[5] This sum includes $3,500 for a loan origination fee; $115,156.06 for principal advanced to Sleestak; $1,100 for late fees; $22,410.72 for interest accrued as of February 14, 2022; and $24,410.72 for costs and attorney fees as of March 31, 2021. Doc. No. 58 at 5.

MEMORANDUM OF DECISION - 4

There is no significant Idaho case law addressing the validity of a deed of trust that failed to properly appoint a trustee. However, Washington has a nearly identical statute to I.C. § 45-1504—RCW 61.24.010—and the Washington Court of Appeals has addressed the question of whether a deed of trust is invalid due to a failure to initially appoint a trustee, even if one is later appointed. In *GMAC Mortg. Co v. Wynkoop*, 2007 WL 2909651, at *2 (Wash. Ct. App. Oct. 8, 2007), the plaintiff argued that a deed of trust where a trustee had not been designated at the time of drafting, but was later appointed, was invalid because a "trustee is necessary to secure the performance of the grantor to the beneficiary." However, the court noted that RCW 61.24.010(2) "contemplates that a deed of trust may not name a trustee and specifically provides that in that situation, the beneficiary has the authority to name one." As such, the court found that the lack of trustee at the time of drafting did not render the deed of trust invalid and the defendant's subsequent appointment of a trustee was permissible. *See also Renata v. Flagstar Bank, F.S.B.*, 2015 WL 4528044, at *4 (Wash. Ct. App. July 27, 2015) (noting briefly in dicta that there is no authority dooming a foreclosure on a deed of trust where the initially designated trustee was unqualified).

Other courts have also considered the validity of a deed of trust where no trustee was appointed. In *Moon v. GMAC Mortg. Co. (In re Burche)*, the bankruptcy court held that a deed of trust could not be avoided where the deed of trust did not initially include a trustee, but there was post-petition effort to substitute a trustee. 249 B.R. 518 (Bankr. W.D. Mo. 2000). In so holding, the court noted that state law did not invalidate a deed of trust for the failure to name a trustee. *Id.* at 522–23. Thus, as of the petition date, the

MEMORANDUM OF DECISION - 5

creditors had a valid lien on the subject property despite the failure to include a trustee. *Id.*[6] Additionally, other states have held that the failure to appoint a proper trustee does not render the deed of trust unenforceable. *See Shuster v. BAC Home Loans Servicing, LP*, 211 Cal. App. 4th 505, 510–11 (Cal. Ct. App. 2012) (holding failure to appoint a trustee did not render a deed of trust unenforceable); *In re Bisbee*, 754 P.2d 1135, 1137 (Ariz. 1988) (noting that under Arizona law "the only effect of the absence of a valid trustee is that no action required to be taken by a trustee may be taken until a successor trustee is appointed.").

Likewise, the Court finds the deed of trust here was enforceable as of the petition date despite the failure to appoint a proper trustee. I.C. § 45-1504(2) permits the appointment of a trustee or successor trustee "if a trustee is not appointed in the deed of trust." Additionally, like under the Arizona law discussed in *Bisbee*, Idaho law permits a beneficiary to bring certain actions without a trustee, such as a judicial foreclosure brought pursuant to I.C. § 45-1512. *See* I.C. § 45-1503. As such, Idaho law contemplates situations where a deed of trust is created or enforced without a trustee. Accordingly, the Court finds the failure to properly appoint a trustee does not render a deed of trust unenforceable under Idaho law. Thus, the Court finds that though no qualified trustee was appointed initially in the deed of trust, the deed of trust was still

---

[6] Further, the court held that because the deed of trust was valid despite the lack of trustee, the act of appointing a substitute trustee post-petition was not an act to create, perfect, or enforce a lien in violation of § 362(a)(3). *Id.* at 523–24.

MEMORANDUM OF DECISION - 6

enforceable at the time the bankruptcy petition was filed, regardless of the subsequent appointment of a proper trustee.

### 2. Fraud or Misrepresentation

Plaintiff also asserts that the deed of trust is invalid due to fraud. In the complaint, Plaintiff asserts Defendant

> wrongfully established the Subject DOT and corresponding promissory note to prevent Weig from receiving all or some of the monies to which he is legally entitled. Further, that the agreement to enter into the Subject DOT, as well as any monetary transfers pursuant thereto were made without the affirmative vote of Weig, a 50% member of Debtor. Weig believes that Stanley did not loan to Debtor or pay amounts on behalf of Debtor as set forth in the declaration of Stanley.

Plaintiff has now expanded that argument and asserts that that Defendant committed fraud and misrepresentation against Plaintiff. To the extent Plaintiff is seeking a monetary judgment against Defendant for fraud, that is beyond the scope of the Complaint and the Court will deny such relief. To the extent Plaintiff is seeking to invalidate the deed of trust due to fraud or misrepresentation, the Court finds Plaintiff has not carried his burden.

The elements of fraud under Idaho law are "'(1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity [or ignorance of its truth]; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury.'" *Roost Project, LLC v. Andersen Constr. Co.*, 437 F. Supp. 3d 808, 824 (D. Idaho 2020) (quoting *Frontier Dev. Grp., LLC v. Caravella*, 338

MEMORANDUM OF DECISION - 7

P.3d 1193, 1198 (Idaho 2014)). Fraud must be proven by clear and convincing evidence. *Frontier Dev. Grp.*, 338 P.3d at 1198.

First, Plaintiff points to statements made by Defendant that Plaintiff would be entitled to 50% of the profits from the sale of the Property. However, the only evidence supporting Plaintiff's assertion is his testimony, which Defendant refutes. With such a sparse record, the Court has a difficult time finding that such statements were made. Further, Defendant also points to a text message sent by Plaintiff after the purchase of the Property which states "[p]lease let me know if you can give me my down. I don't want to make any money. I just really need it. Thanks." Ex. 209. This text message undermines Plaintiff's assertions that he was relying on statements that he would receive 50% of the profits from the sale of the Property. Thus, to the extent any statements were made, it does not appear that Plaintiff actually relied on those statements. Additionally, Plaintiff presented no evidence as to Defendant's intent. Accordingly, the Court finds Plaintiff has not provided clear and convincing evidence to support his claim of fraud.

### 3. Need for the Approval of LLC Members

Next, Plaintiff asserts the deed of trust is invalid because he, as a member of Sleestak, did not consent to Sleestak entering into the transaction. Importantly, the Court notes that the issue of whether Plaintiff is a member of Sleestak is the subject of a different adversary proceeding. However, the Court need not reach a conclusion as to

MEMORANDUM OF DECISION - 8

whether Plaintiff is a member, because the Court finds even if Plaintiff were a member, Sleestak did not need his approval to enter into this transaction.[7]

Under I.C. § 30-25-109, an LLC operating agreement does not need to be written and may be oral or implied. However, Defendant produced a written operating agreement for Sleestak that lists Ms. Nelson as the sole member. Ex. 206. As the sole member, the operating agreement provides Ms. Nelson "has sole authority and power to act for or on behalf of the Company, to do any act that would be binding on the Company or incur any expenditures on behalf of the Company." *Id.* at 7. Plaintiff asserts he never saw the written operating agreement, and that he and Defendant had an oral agreement that they were 50% members of Sleestak, with Sarah Nelson acting as a manager. Thus, Plaintiff asserts under their oral agreement Sleestak is a manager-managed LLC, with Sarah Nelson acting as the manager.

While an operating agreement is generally the governing document for an LLC, "[t]o the extent the operating agreement does not provide for a matter," Chapter 30 of the Idaho Code governs. Under I.C. § 30-25-407, in a manager-managed LLC, "any matters relating to the activities and affair of the company is decided exclusively by the manger, or if there is more than one (1) manager, by a majority of the mangers." However, for activities outside the ordinary course of the LLC's activities and affairs, the consent of all members is required. Thus, Plaintiff has to demonstrate that entering into the deed of

---

[7] Plaintiff also asserts the amount owing under the deed of trust should be reduced because Plaintiff did not consent to the various purchases on behalf of Sleestak. For the same reasons discussed in this section, the Court finds even if Plaintiff was a member of Sleestak, his consent was not necessary.

MEMORANDUM OF DECISION - 9

trust was outside the scope of Sleestak's ordinary activities and affairs. Plaintiff provided little argument as to why the deed of trust was outside the scope of Sleestak's affairs and activities. Borrowing money is a common practice for businesses. Further, the expenditures claimed by Defendant under the promissory note are related to property maintenance, such as payments for construction materials, landscaping, and paint, as well as the payment of taxes. *See* Ex. 202 at 1–2. As such, even disregarding the evidence presented by Defendant as to Sleestak's written operating agreement and accepting Plaintiff's assertions of an oral agreement as true, the Court finds Ms. Nelson, as the manager of Sleestak, had the authority to enter into the deed of trust. Thus, Plaintiff's lack of consent to enter into the deed of trust or the purchases made utilizing the funds from the promissory note does not render the deed of trust invalid.

### B.   Payments as Contributions

Next, Plaintiff asserts that any of the funds expended by Defendant on behalf of Sleestak should be treated as member contributions rather than a loan secured by the deed of trust. This argument was not raised in the complaint. However, even if it was, the Court finds Plaintiff did not satisfy his burden. In *Lettunich v. Lettunich*, the Idaho Supreme Court affirmed the lower court's ruling that funds contributed by a partner to a partnership should be treated as a capital contribution rather than a loan because there was no written record that would support a finding that the contribution was intended as a loan. 111 P.3d 110, 118 (Idaho 2005). Here, there is significant evidence, both from Defendant's testimony as well as the promissory note and deed of trust, that the funds given to Sleestak were intended as advances on a loan. Plaintiff did not present evidence

MEMORANDUM OF DECISION - 10

to show the funds were not intended as a loan but rather as a capital contribution and cites to no cases that support his position. As such, the Court finds that the funds advanced by Defendant were a loan, not capital contributions.

C. **Amount Owing under the Deed of Trust**

    1. **Amount Not Actually Expended on Behalf of Sleestak**

In addition to claiming the deed of trust as a whole was ineffective, Plaintiff also asserts Defendant did not actually provide certain funds and that certain payments should not be credited in favor of Defendant. Plaintiff makes these allegations based on his argument that there is either a lack of information to trace the source of the payments or because the payment was for something outside the ordinary activities and affairs of Sleestak.

Defendant asserts he advanced $115,156.06 under the promissory note.[8] Defendant extensively documented the payments made on behalf of Sleestak as advances on the loan and provided the receipts. Ex. 202. The majority of the payments were for maintenance of the Property, including purchases of siding materials, paint, security systems, and utilities. *Id.* Plaintiff provided no support for his assertions that these payments were not actually made by Defendant on behalf of Sleestak or that these purchases were outside the scope of Sleestak's business.

There is one payment asserted under the promissory note that raises the issue of whether it can properly be considered an advance by Defendant under the loan. On May

---

[8] Initially, Defendant asserted he extended $116,356.06 under the promissory note. However, Defendant has since reduced that sum to exclude post-petition payments made to Aaron Tolson and Jessica Hyde.

MEMORANDUM OF DECISION - 11

31, 2019, the same day the parties purchased the Property, Defendant met with Jon Lovitt in a retail parking lot and paid him $30,000 cash. *See* Ex. 202. at 1, 8. Defendant testified the $30,000 was part of the transaction to purchase the Property and the documentation listing the expense describes this transaction as "Cash Payment for purchase of property and to include existing lease on property, all equipment, tools, fixtures, furniture, appliances, and commercial lighting and signage." Though there are relatively sparse details describing Mr. Lovitt's relationship to the Property and Sleestak, the Court finds there is sufficient evidence on the record supporting the assertion that the $30,000 cash payment to Mr. Lovitt was paid by Defendant on behalf of Sleestak in order to acquire the Property, particularly considering Plaintiff's failure to provide any evidence refuting the payment.

Because Defendant provided sufficient testimony and documentation as to the payments made on behalf of Sleestak under the promissory note, and Plaintiff did not sufficiently rebut any of the evidence presented by Defendant, the Court finds Defendant advanced $115,156.06 in principal under the promissory note.

### 2. Prepetition Loan Fees

In addition to the principal advanced under the promissory note, Defendant asserts he is entitled to a $3,500 loan origination fee and late fees due under the promissory note. Section 5 of the promissory note authorizes Defendant to recover the reasonable fees, costs, and expenses "incurred by Lender" in hiring professionals in connection with the "preparation, modification or enforcement" of the promissory note and loan documents. Ex. 201. Defendant, however, did not hire a professional to prepare any of the loan

MEMORANDUM OF DECISION - 12

documents. Instead, he testified that he prepared the documents himself. Because Defendant did not incur any fees, costs, or expenses while employing a professional to prepare the loan documents, the terms of the promissory note do not authorize him to charge a $3,500 loan origination fee, and this fee will not be included in Defendant's claim.

The promissory note does authorize Defendant to charge a $100 late fee if a loan payment is not received by Defendant within ten days of it being due. Ex. 201. Section 2.1 of the promissory note required Sleestak to make its first payment on December 31, 2019, with quarterly payments due thereafter. *Id*. Defendant, however, attempts to claim late fees for three payments purportedly not made in 2019. Ex. 205. Pursuant to the terms of the promissory note, Sleestak was only required to make one payment in 2019. Thus, two of those late fees are improperly charged. The Court finds that Defendant is entitled to recover seven prepetition late fees, totaling $700. These late fees correspond to one payment in 2019, four payments in 2020, and two payments in 2021 that predate the June 11, 2021 petition date.[9]

### 3. Payments Made by Big Sky Auto Wholesale

Finally, Plaintiff asserts Defendant received payments from Big Sky Auto Wholesale ("Big Sky") and its owner Michael Montee, and that such payments should act to reduce the amount owing under the promissory note. Plaintiff alleges Defendant received payments directly from Big Sky totaling $40,000 as part of a lease agreement

---

[9] Defendant also asserts he is entitled to recover late fees for payments due after the petition date. The Court addresses post-petition late fees in Section D below.

MEMORANDUM OF DECISION - 13

between Sleestak and Big Sky. However, the record indicates Defendant only directly received $13,668.33 from either Mr. Montee or Big Sky. *See* Exs. 134, 134, & 138. The record also indicates an additional $3,652.01 was paid to Sleestak from Big Sky and $5,098.93 was paid to Sarah Nelson from Mr. Montee. Exs. 136 & 137.

      Big Sky and Sleestak entered into a business relationship relating to the operation of a car lot. Ex. 140. Under the business-to-business agreement between the parties, Sleestak allowed Big Sky to sell vehicles on the Property. This agreement did not provide for rental payments. Rather, the parties agreed to share profits from the vehicle sales. Though not a named party to the agreement, the contract also contemplates Defendant personally consigning vehicles on the lot. Ex. 140 ("All profits from consignment sales to be split 50-50% between Sleestak LLC and Big Sky Auto Wholesale . . . other than Sleestak LLC or Mike Stanley personal consignments."). The percentage of profits shared between the parties varied based on which entity purchased the vehicle for sale on the car lot. For example, when a vehicle was purchased by Sleestak, by Defendant on behalf of Sleestak, or by Defendant personally, Big Sky would receive either 20% of the net profit or a specified flat fee, whichever was lowest. Ex. 140. Big Sky would then pay the remaining profits to Sleestak or Defendant within a specified timeframe.

      As noted above, Defendant received funds from Mr. Montee or Big Sky. On August 16, 2019, Defendant received a check from Big Sky for $5,850 "for cars." Ex. 135. Then, on February 13, 2020, Defendant received a check from Michael Montee for

MEMORANDUM OF DECISION - 14

$4,524.17. Ex. 138. Finally, on February 26, 2020, Defendant received a check from Big Sky for $3,294.16 with "loan repayment" written in the memo line. Ex. 134.

Plaintiff asserts that the "loan repayment" written on the memo line indicates the funds from Big Sky and Mr. Montee were Sleestak funds paid to Defendant as a repayment on the promissory note. It is unclear who included "loan repayment" on the memo line of the check from Big Sky to Defendant, as Mr. Montee testified that he did not write it. Mr. Montee further testified that Defendant had asked to receive Sleestak's profit checks from the business-to-business deal directly because there were issues with Sleestak's bank account.

However, Defendant refutes Mr. Montee's testimony and asserts the business-to-business arrangement never became profitable and neither Sleestak nor Defendant received profit payments per the agreement. Rather, Defendant testified Mr. Montee and Big Sky would occasionally borrow money from Defendant when they were purchasing cars at auction but did not have enough cash and these checks reflect repayment of those funds. To support his assertion, Defendant points to a receipt from November 21, 2019, which indicates Defendant purchased several cars at a vehicle auction under Big Sky's name. Ex. 207. The receipt includes a handwritten acknowledgement, signed by both Defendant and Mr. Montee, that Defendant purchased the vehicles, and that Big Sky would pay Defendant back when the vehicles were sold and paid for. *Id.* The receipt mentions the business-to-business contract. However, the receipt makes no mention of Sleestak, and the business-to-business contract contemplates Defendant personally consigning vehicles. Further, the vehicle purchases memorialized by the receipt are not

MEMORANDUM OF DECISION - 15

included on the document listing the expenses paid for by Defendant on behalf of Sleestak under the promissory note. *See* Ex. 202. As such, the Court finds the receipt supports Defendant's version of events.

Additionally, Defendant presented the testimony of James Walter to establish that the car lot located at the Property was not successful. Mr. Walter worked as a salesman for Big Sky for six months and was paid on commission. Mr. Walter testified sales were slow at the lot on the Property and he made very little money while he worked there. Further, Mr. Walter testified Mr. Montee would only periodically show up at the Property, and instead would often work from and sell vehicles at his other lot, which was not covered by the business-to-business contract.[10]

Taken together, the receipt indicating some sort of deal between Defendant personally and Big Sky and Mr. Walter's testimony support the assertion that the business-to-business deal never became profitable and the checks were not profit payments. As such, the Court finds the payments made by Mr. Montee and Big Sky directly to Defendant are not repayments on the promissory note and the Court will not reduce the amount owing under the promissory note for such payments.

**D.    Allowance of Interest and Fees under § 506(b)**

Because Plaintiff failed to present sufficient evidence to invalidate the deed of trust or the sums expended under the promissory note, the Court finds Defendant has a

---

[10] The business-to-business contract specified it only covered the activities that occurred at the car lot located at the Property. Ex. 140.

MEMORANDUM OF DECISION - 16

claim of $115,856.06 secured by cash collateral held by the bankruptcy estate. This sum includes $115,156.06 in principal as well as $700 for prepetition late fees.

Defendant also asserts he is entitled to interest and reasonable fees, including post-petition late fees and attorney fees, under § 506(b). Under § 506(b), a secured creditor may recover "interest on such claim, and any reasonably fees, costs, or charges provided for under the agreement or State statute under which the claim arose." There "are four requisites for fees under this section: (1) the creditor's claim is an allowed secured claim; (2) the creditor is oversecured; (3) the fees are reasonable; and (4) the fees are provided for under the agreement." *Crawforth v. Ajax Enters., LLC (In re Pheasant Cove, LLC)*, 2008 WL 187529, at *7 (Bankr. D. Idaho Jan. 18, 2008).

The Bankruptcy Code does not provide for a procedure in determining § 506(b) claims. *Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 231 (9th Cir. BAP 2003). The bankruptcy court in *Ballard v. Chrysler Fin. Corp. (In re Powe)*, 281 B.R. 336 (Bankr. S.D. Ala. 2001), noted that in a request under § 506(b), "[n]otice must be given which is 'reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'" (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). In relying on *Powe*, the Ninth Circuit Bankruptcy Appellate Panel held that a Rule 2016(a) application or a proof of claim may be procedurally appropriate avenues for asserting a § 506(b) claim, though did not exclude the possibility of other avenues. *Atwood*, 293 B.R. at 231.

MEMORANDUM OF DECISION - 17

Here, because there are interested parties who are not a party to this adversary proceeding, i.e. the chapter 7 trustee, and have not had an opportunity to review or present possible objections to the interest and fees requested under § 506(b), the Court determines there has not been sufficient notice to satisfy due process.[11]  As such, the Court will not consider Defendant's request for post-petition late fees, interest, or attorney fees under § 506(b) in this adversary proceeding.

**CONCLUSION**

Accordingly, the Court finds the deed of trust and promissory note are valid. Further, Plaintiff did not present sufficient evidence in disputing the amounts paid under the promissory note.  As such, the Complaint will be dismissed.  Counsel for Defendant shall submit a form of judgment consistent with this decision.

DATED:  July 24, 2023



_____
NOAH G. HILLEN
U.S. Bankruptcy Judge

---

[11] The Court notes Defendant did include a request for attorney fees, late fees, and interest in a motion to compel turnover from the sale proceeds filed April 18, 2022.  Case No. 21-20237 at Doc. No. 79.  However, that motion did not reference § 506(b) and only included fees up through the date of filing.

MEMORANDUM OF DECISION - 18